All rise. The United States Court of Appeals for the Ninth Circuit is now in session. Good morning courtroom and good morning to my colleagues. I'm Judge Gould and I'm presiding today. And sitting with me are Judge Berzon and Judge Christin. And the lawyers should be able to see all three of us. I want to preliminarily thank both the IT people for helping to set this up and also all the counsel who have cooperated with us in a flexible way so that we could do these arguments remotely. I think without further ado, we can start the first argument. And I'll also mention that although the clock states for every advocate the time allowed for their argument, remember that clock runs downward. And so if it gets to zero, it'll start to go up. But you may be out of time at that point. When the numbers increase, you're out of time. However, because of the stresses and extra difficulties of the video, we'll give some extra time if anyone needs it to present their case. Without further ado, we proceed to the first argument. And counsel can proceed. Good morning, Your Honor. May it please the Court. Now I'm hearing an echo. Can I be heard? Yes. Okay. I'm Robert Tolchin. I represent the plaintiffs in this matter other than Reynaldo Gonzalez. Reynaldo Gonzalez is represented by Mr. Altman, who I believe is also online, although I don't see him. And we have agreed to divide our time with the final five minutes to Mr. Altman and the first 15 minutes to myself. And may it please the Court. If I may, what I would like to do is to spend five minutes or less just making a statement explaining how I see the case. And I'm not going to ask for any rebuttal time. I want to begin with the fact that the terror group involved here, ISIS, declared its state on YouTube. They made a video called The End of Sykes-Picot, referring to the agreement at the end of World War I, the Sykes-Picot Agreement, that created the nation-states of the Middle East and the current borders of the Middle East, and that ISIS views as anathema to its aspiration to create an Islamic state throughout the Middle East, employing its version of Islam. Now, without YouTube, without the services that YouTube and similar services provide, ISIS would likely have been a 50 to 100 people organization on the back streets of provincial towns in Iraq, perhaps handing out flyers made on a mimeograph machine like Yippies in 1970. Because of social media like YouTube, the social distance between ISIS and its adherents, between ISIS and the people who it wanted to get its message out to, has been eliminated. The target audiences suddenly are able to be in direct communication, instead of being limited to a few radicals handing out flyers in Basra. There are many, many legal issues in this case, and it is a very, very long complaint, and we've read it, and we believe it's a legal issue. The issue in this case is not the content of the messages, it's the fact that the terrorists are able to spread their messages, whatever the messages may be. The fact that YouTube provides services to known terrorists, designated as terrorists and terrorist organizations by the United States government, with whom it is illegal under the ATA to do business. Congress has said thou shalt not do business with terrorists, but Google, through YouTube, says, hey, that doesn't apply to us. We can provide services to terrorists, services that everybody else in America, you, me, a bank, a store, if they wanted to order face masks, they would have to get a license. Because they are non-vrata, they are designated terrorists, and nobody's allowed to do business with them, but Google says that they're immune. Now, 230, Section 230 was never intended to insulate such abhorrent behavior by a major flagship American company. Now, the definition of international terrorism contained in 2331, subsection 1b, is that it's conduct that's intended to intimidate or coerce a civilian population and to influence government policy. The services provided by YouTube are essential for their message. The terrorist strategy is to do big, horrendous things, kill people, hurt people. Counsel? Counsel? Counsel? You're just getting to one of my questions about the definition of international terrorism, please, under 2331. So we would have to find that Google intended – that you plausibly allege that Google intended to intimidate or coerce a civilian population, right? No. Why not? No, that's not what I'm saying at all. ISIS is the terrorist group. ISIS – Okay. I understand what ISIS is. So forgive me. I know it's a terribly important case, but I share Judge Berzon's sense of urgency about getting to the actual elements of the offense. So forgive me for cutting to the chase, but I'm really trying to apply the law here. For your direct liability claims, we're looking at Google's conduct, not ISIS's conduct, right? I would tend to – if you ask me, I would not agree, but I understand we are living in the Fields universe. This is the court that handed down Fields. I disagree with Fields. What does Fields have to – Fields is a secondary question of proximate cause, but the first question is, who is the international terrorist organization that we're talking about? The international terrorist organization. Of the direct liability statute. Right, but I'm – my next – had I continued, I was going to say that for me, the most direct path to liability here is the aiding and abetting provisions. All right. So you're going to talk about that then? That's probably true. Yes, because – But you started talking about the international terrorist organization and Fields, and Fields only applies in the direct liability section. So if we're not talking about direct liability, we don't need to talk about Fields. Is that right? Because nobody's claiming that there's a cause problem with regard to aiding and abetting. Is that right? I agree with you. Well, Google will tell you that there's a cause problem because – Well, no, they didn't. In their brief, they didn't. Not on the ending of anything. Well, not a field problem, but we get to Halberstam. But for your strongest cause, you were saying you think your strongest claim is secondary liability, conspiracy or aiding and abetting? Aiding and abetting. Okay. So for aiding and abetting, then we get to Halberstam, right? Correct. Okay. So my question about Halberstam is the third prong. I think we would have to find that Google must have knowingly and substantially assisted in the principal violation under Halberstam. Is the principal – my first question – is the principal violation the Paris shooting? That's a complicated answer, and it has a few components, and I ask Your Honor to bear with me. Okay. We have to define what is terrorism. If I don't like somebody and I go and beat him up or kill him, that's one thing. Terrorists, though, are not engaged in mere assassination or – they're not just trying to destroy a building when they blow it up. They're not demolition people. What they are trying to do is blow up a building in a grand way, in a horrific way that horrifies people, and then put that message out in the world because the ultimate definition of international terrorism contained in 201B is to intimidate the civilian population or to influence government policy. So doing their terrorist activities in a vacuum where nobody hears about it doesn't – is not international terrorism. What is essential is the population. I understand. I understand the point. So the terrorist – And the principal violation is – what do you allege? That's all I need. The principal violation is obviously the shooting that killed Plaintiff Noemi Gonzalez. Okay. What makes it international terrorism and not simply murder is its nature and character of intimidating the world, scaring the hell out of everybody, you and me, making us afraid to go to Paris, making us afraid to travel. Sir, could I ask another question, please? Could I ask another question, please? Yes. I understand now that the principal violation is this terrible shooting. I understand that. There's another place where your complaint alleges that the injury, which I believe is Ms. Gonzalez's death, was exacerbated by the post-event bragging on the Internet. Is that part of your claim to injury? The post-bragging is part of what makes this international terrorism according to the definition contained in 2231. Excuse me. Is it part of the principal violation? I would have to say yes. I would have to say yes. All right. I have a related question. May I ask a related question under Halverson? Sure. There's a six-part test about whether the assistance was substantial in character. I know you know this, but I think part four is Google's relationship to the principal. My question for you, sir, is ISIS the principal or is the shooter the principal under your theory? I believe ISIS and the shooter are both principals. Okay. The shooter was acting on behalf of ISIS, and I don't see a true distinction between them here. They were all acting in support of the ISIS agenda. And in this case, unlike others, there's no doubt that ISIS was, in fact, responsible for the attempt, right? I don't think anybody seriously questions that. And if they did, I would submit, Your Honor, that that is a factual issue that would have to be explored in discovery and can't be the basis for a 12B6 motion. I mean, maybe Google will be able to prove that it wasn't ISIS, it was something else, but that's factual to be developed. Google knew, getting back to those Halberstam factors, Your Honor, and I would caution to say it's not a six-part test. I view it as more factors to be considered. I agree. Not necessarily all of them in equal measure in every case, but Google knew, and we will endeavor to prove if the case proceeds to discovery, that Google knew it was providing services to ISIS. Maybe they didn't know the first time they did it, but when somebody complains and somebody flags a video and says, Hey, this is ISIS content, then Google becomes aware. Google also can't be living in a Skinner box completely unaware of the fact that everyone all over the world has been talking about how Google is providing services to terrorists. We know about it. We've had many cases about this. So Google was certainly aware that its services were being used by terrorists, which raises the question. It's not the point of the message, which terrorist group or what they're saying. This could be a video put out by ISIS about a cooking video trying to generate an ISIS community. May I ask another question? I think I only have one more. You've also alleged in the third amendment the complaint that Google gave material support in the form of revenue sharing with ISIS. And my question, sir, is whether or not that complaint, sorry, the allegation of revenue sharing is intended to be just a direct liability assertion, or are you also pleading that theory in relation to secondary liability? Your Honor, I'll confess to not having thought that through. I would say both, but I would also say that I believe Mr. Altman was planning to address the revenue sharing aspect of the complaint. Counsel, it's Judge Gould speaking, if I may. Many of the problems that you've advocated are broad societal problems caused by the videos being displayed after the act. What I want to know is, although publicity of the terrorist act can cause other injuries, how do our standing rules affect what your client is able to make a claim for? There may be some harms here that should be addressed by Congress, and it may have not regulated sufficiently. But still, what does Gonzalez have standing to tell? Thank you for that question, Your Honor. My clients are the survivors of Naomi Gonzalez, who was brutally murdered and suffered horrendous damage. If anybody has standing, it's these people. If I understand Judge Gould's question, let's assume that there was, and there appears to have been, a part of the overall scheme post, after the murder, various YouTube submissions that lauded the act, made a lot out of it and threatened people and tried to make policy changes and so on, and argued that this would affect Western democracies and so on. But how does that, if we thought that that was integral to the principal violation, how does that injure your client? I hope that I understood Judge Gould, but that's my question. I don't think it's part of the injury, per se. My client's injury is obviously that she's dead. But all of that is in the complaint and is harped on in the briefs because that is part and parcel of international terrorism. Congress, in enacting the Anti-Terrorism Act, said, thou shalt not do business with designated terrorists. Google is doing business with designated terrorists. And the Anti-Terrorism Act and its subsequent amendments, including JASTA, gave people who are killed or injured as a result of international terrorism the right to sue. I'm arguing that essentially they wouldn't have killed her if they weren't going to go on afterwards and do the rest of this, because it was all part of the whole scheme. They weren't just trying to kill somebody, they were also trying to make a major international point. So it is, in that sense, part of the principal violation. That's what I understood. Yes, in that sense. In order to bring, look, if I go and kill somebody and that person's survivors want to sue me, it would be a wrongful death case. Maybe assault and battery. But what brings it into the Anti-Terrorism Act, and what allows us to bring this case in U.S. courts over things that happened in other jurisdictions, in other countries, is because it has a quality that's more than just a simple assault and battery. It's an act of international terrorism. And all these goals of spreading the message, recruiting members, aggrandizing themselves through this act, is what distinguishes this murder as an international terrorist act as opposed to an ordinary assault and battery. We are running into your complaints. Yes. I understand we're allowing that. Here are two other questions. Let me just comment that we will add time to the clock for this council and for Mr. Tolchin. So the two pieces, the HEA and Section 230, have to move together to some degree. Your claim with regard to Section 230 is that even the posting is not protected by Section 230, or that some of the matching and giving suggestions and showing people ISIS videos that didn't ask for it, and also the revenue sharing, is that what's outside 230? What are you arguing is outside 230? Everything or what? Well, everything, but I'll give you a prioritized ranking. Obviously, because of the contours of Section 230, I'm looking to prioritize the things that Google has done that have nothing whatsoever to do with specific content. I know that when we get into content, you should have removed this video, you should have removed that video. Now we're talking about editing, and it sounds like publishing. I understand that. I mean, I also believe that Section 230 has been enlarged beyond what it was ever intended, but I'm not talking about that right now. Providing services to ISIS and ISIS members is a core problem. Any services. You know what, if you try to go into a bank and send a wire transfer to ISIS, it won't get past the front clerk. They'll say, this is on the list of designated terrorists. We can't take this transaction. If somebody in ISIS tries to call up 3M and order a shipment of face masks, they can't do it. But the service is allowing somebody to post content. That's the fundamental service, right? In the terms of the ATA and the definition of material support, providing services, and it specifically enumerates communication systems. Communication systems is so important that it's not even just lumped in with services. It's a specific term. YouTube is nothing but the most amazing... But what I'm not understanding, then, is that you're saying you're not talking about the content, but you are talking about the content, because the service is allowing the content. That's the main service, right? I disagree. There's a big difference between saying, I am allowing you to post videos on the one hand, or saying, I am allowing you to post this video but not that video. Allowing somebody to use your service is content neutral. You are not allowed to provide services to ISIS. A printing press, if there was a printer who got an order from ISIS to print flyers, he can't do it. It doesn't matter what's the content of the video, what's the content of the flyer. You may not provide any services to a designated terrorist organization. I have a second generic question, which is... We had Namita's brief raising First Amendment problems here. Aren't there First Amendment problems here? How could the government forbid Google to... Or at least without applying First Amendment standards, like... Inducement and so on. What kind of content can be regulated under the First Amendment? There's no First Amendment argument in this case, except by me, because I understand that. But in determining the reach of 230, don't we need to think about that? I don't think we need to get to the First Amendment, because the First Amendment would be involved, perhaps, if we were talking about content of communications. You may not say this, you may not say that. It is a federal crime to provide services to a terrorist organization. And nobody has ever... No court has ever held that that statute violates the First Amendment right of Americans to provide services to designated terrorists. We're not talking about providing services to ISIS, any services, without regard to the content. And this is what the Supreme Court was talking about in Holder v. Humanitarian Law Society. So you're basically saying, this is like a printing press. If you gave them a printing press, that would be aiding and abetting ISIS, and they're basically giving them a printing press. A hundred percent. Exactly. Okay, counsel, we're through the first 20 minutes, plus another almost three minutes. And we haven't given Mr. Tolton his five minutes. Pardon me? He's Altman. We haven't given Mr. Altman his five minutes. So what I'm going to suggest is this. You should bring your argument to a close, and we should let Mr. Altman have his full five minutes. And even though you've used your time, I'll give you an extra two minutes for rebuttal after everyone's finished. Okay. Your Honor, we can consider my argument closed. I don't want to take up... I don't want to overstay my welcome. Okay, thank you. Good morning, Your Honors. This is Keith Altman on behalf of Reynaldo Gonzalez. Can everybody hear me okay? Yes, I can hear you. Your Honors, I have several things to cover in a short period of time, so I'll do my best. One of the things I wanted to clear up, Your Honors had asked a question, you know, what's the connection? Is it to ISIS or to the operative? It is to ISIS. There is a connection between Google provides, knowingly provides material support to ISIS. ISIS goes out and executes a terrorist attack. There doesn't have to be a connection directly between Google and the operative who actually executed on behalf of ISIS. Excuse me, are you talking direct liability or aiding and abetting? I'm talking about the aiding and abetting. Okay, all right. The aiding and abetting. And I think some of the courts have gotten confused about whether Google has to be directly talking to the person who goes out and does the shooting. That is not what's required under JASTA. I think it is clear if you help a terrorist organization and that terrorist organization goes out and commits a terrorist attack, you can be held accountable for that attack even though you didn't know what they were going to do, you didn't know who was going to do it. It's that simple. Wait, wait, wait. Cancel, cancel. I'm not sure it is that simple. Can you help me out then? If you're talking now about aiding and abetting liability, secondary liability under 2333D, and you just said it's that simple. We have to get through the Halberstam test, right? I think there's no question. Of course, Your Honor. I didn't mean to shortchange Halberstam. I'm just saying, assuming that you get over the Halberstam test. All right. That's the problem. That's no small hurdle. The second prong, and if you could really just focus on this, please. Judge Gould has indicated he's going to give you more time, but this is very important. The second part of that test requires that you possibly allege that Google must have been aware of its role in the overall scheme. That's one thing. But the third part of the test, and I think you've spoken to that and your co-counsel has, but the third part is that Google must knowingly and substantially assist in the principal violation. That's correct. How did Google knowingly and substantially assist? And I understand that there's six factors to consider, but if you could speak to that, please. Of course. And throughout the complaint, we talk about the fact that it is well-established that ISIS would not exist in the form that it is absent social media and their use of social media. They use it to recruit. They use it to radicalize. They use it to raise funds. Number two, Google and the others have been well aware that ISIS has been using their platforms for a very long period of time. That has been adequately – that has been pledged substantially through the complaint. So I think that meets both of those things. It would be inconceivable for Google or any others to say they don't know that ISIS and other nefarious organizations are using their sites, and it would be inconceivable for them to argue that this was not enabling ISIS to operate and to project – But what is knowingly assist the principal violation? Now, Halberstam, in fact, the wife who was the aider and abetter didn't – they didn't require that she knew that he was going to go out that night and do the particular robbery. So what do they mean by the principal violation? Listen, ISIS is well-established. I'm asking about Halberstam right now. Just a minute, please. You know, Your Honors, to be perfectly honest, I had planned on focusing on the Section 230 issues and not as much the Halberstam factors. All right. So why did you let them do that? Okay. So what about – we were told that you were going to discuss the revenue sharing, essentially, which seems the most likely to survive 230. My question specifically about revenue sharing is whether or not you allege it only as direct liability, first of all, or do you also allege it in secondary liability? Because the district court thought it was just a direct liability claim. Your Honors, I believe that we've alleged it in such a way that it is direct or secondary. If you provide financial support to ISIS – excuse me – you are aiding and abetting. So from a secondary liability perspective, I think it's – Are you knowingly insisting the principal violation, or is that a necessary element? Yes, you are knowingly. If you know that ISIS is using your tools and you provide money to ISIS, then you are – that is the principal violation. You're giving money to ISIS, ISIS goes out and conducts – ISIS goes out and conducts attacks. So the principal violation is essentially ISIS's terrorist attacks generally, or maybe in Europe or something like that, just as in Halberstam it was burglaries in general, not any particular one. That's correct, Your Honors. ISIS has no legitimate purpose. ISIS is not like – using Hamas as an example, Hamas has humanitarian activities that you can argue was legitimate or not legitimate. ISIS has no legitimate purpose. Its sole purpose is to conduct terrorist operations. Its sole purpose is to scare and cause changes in policies. That's the only thing it does. And so you can't say with a straight face, well, he didn't know that ISIS wasn't going to go out and do an attack. Counsel, with all due respect, please, that's just prong two. That's just Google must have been aware of its role in the overall scheme. And what I'm asking you to focus on, if you could please, is the third prong. Maybe you just want to go to 230 and don't want to do this, but our question really is focused on the third prong of the Halberstam test, that Google must have knowingly and substantially assisted in the principal violation. So we talked about whether the principal violation is limited to the parachuting, and I think we understand now that it's not. Is that right? That's correct. It's a bigger global terrorist. They are a global terrorist organization. Okay. So now my question is, how did Google knowingly and substantially assist ISIS in carrying out global terror? Is there anything else you want to say about that besides what you've already said? No. Okay. We knew that ISIS was using their platform. We have pledged that they knew that the effect that allowing them to use the platform would have on ISIS' ability to operate, we think that that's adequate. My colleague, Dan Weinegger, is going to be probably addressing this in more detail on the Claiborne-Tamnay arguments. All right. And he's really the expert on that. Okay. Thank you. As far as 230 goes, it is illegal to provide, to give money to ISIS. And if you look at the terms of service for Google, there's no question that when they place an ad with a video, that they are generating revenue for themselves and they're sharing that revenue. And that's, as Your Honor said, there appears to be no way that 230 protects that kind of content. Now, in terms of some of the other things that they do is that when they promote content to others, I know the court just ruled recently on the Dairov case that that was still under the protection of 230, but there's a distinction between Dairov and here. In Dairov, it is not illegal to promote content that is created by just somebody out on the street, even a drug dealer. But the distinction here is it is illegal to promote content of ISIS, which is a terrorist organization, because in doing so, you are providing assistance, substantial assistance to ISIS. That is an illegal act. That is the distinction between here and Dairov. Wait a minute. It's not illegal to tell somebody to sell a drug? No, I don't think it's illegal to – it is not inherently illegal to promote a – to say to somebody, hey, take a look at this posting by somebody that happens to be a drug dealer. And the posting was, if you come here, I'll sell you drugs. Wasn't that the posting? Yeah, but I don't know that that's inherently illegal, but it is illegal – Why is it inherently illegal? Well, it's for – not necessarily for somebody to say – I mean, I'm not – I'm doing it in a way that I'm not actually promoting drug dealers. But here, if they promote an ISIS posting, it doesn't matter what the content of the posting is. It is always illegal. That's the difference. Counsel, these are – these are very difficult issues, and I'm sure that some of the arguments on both sides are going to stump the panel for quite some time. However – Your Honor, may I have one more minute to bring up one last point? Wait. I'm just going to finish my sentence. I'm sorry. We have gone four minutes beyond the five minutes we gave you. I'll give you another minute, but I need you to wrap up your argument with that minute. Your Honor, the last thing I want to bring up is the creating content. One of the things that's very different about what takes place here – this is not just simply the posting on a bulletin board that was the basis of 230. Based upon what they know about a viewer and what the viewer is looking at, the company puts – Google puts together an ad that goes along with the person and that content. That content is not random. It is very specific. It is unique. It doesn't exist for anybody else. But are you – When you put content – Just a minute. Are you tying anything that happened here to the ad? Yes. That's how they select the ad. The ad is selected. I know, but did the ad cause any of the injury? Any of the ads? Yes, they created content. Is that content that they added relevant to your cause of action in any way? Yes, because we have argued that it makes people stay on a page longer because they're also looking at the ads. That Google is generating revenue out of the – The revenue part I understand, but I don't understand how – If it was the ads that were – With ISIS's ads, I could understand it, but it's not ISIS's ads. Right, but it's the inverse. It's getting you to – It is profiting by placing the ads with ISIS content that creates new content. It would be unfair for Google to be able to generate revenue by saying, I can match up your ad and this person because they're looking at ISIS content and not be held accountable at all for putting that content together, which is unique and doesn't really assist anybody else. I think I've taken my time. Thank you, Your Honor. Thank you very much, Mr. Altman. I guess we now will go to Google's argument, but I want to remind the counsel for appellants that even though they've used their time, I will give them two minutes for rebuttal if they want to. I want that after Google finishes, and Google will also be given extra time for its argument if it needs it. Could we go to Mr. Brian Willen, I think? Yes, good morning, Your Honor. Can you see me? Yes, we can. Thank you for cooperating with this system. Thank you, Your Honor. Brian Willen from Wilson-Sonsini representing Applebees, Google, Inc. This case unquestionably arises from a heartbreaking act of violence, but Google is not responsible for ISIS's terrorist attack in Paris, and settled law requires dismissal of plaintiff's claim. Now, because Section 230 applies to all the claims in this case and because it was the main but not the exclusive focus of the district court's opinion, I plan to focus mainly on Section 230, but of course, as we've explained in our brief and as the court is aware, there are alternative bases for affirming the judgment below, including the proximate cause issue that comes out of this court's decision in fields and the secondary liability issues that I'm sure we'll talk about on the subject, I think, more extensively of the arguments in the next two cases that are going to be argued today. Let me begin with Section 230. So this court does not need to break any new ground to apply Section 230 to this case. It simply needs to follow up its own decisions and, of course, the Second Circuit's recent decision in force, which applied Section 230 to virtually identical allegations and rejected every single one of the arguments. Did force include a revenue-sharing allegation? It did not, Your Honor, and as Judge Ryu recognized, while there are perhaps arguments about whether Section 230 could apply to certain kinds of revenue-sharing, the primary argument that Judge Ryu decided with respect to the revenue-sharing allegations in this case are to simply say that those allegations do not come close to stating a claim under the Anti-Terrorism Act. So first of all, with respect to direct liability, and this also applies to secondary liability, there's simply not an allegation that the plaintiffs have made, and certainly not a plausible one, that if revenue was shared, Google knew at the time that that revenue theoretically was shared, that it was being shared with ISIS. So there's just not a proper allegation of knowledge. Is that right, Your Honor? That is correct. If you look at Paragraphs 533 of the complaint, the Third Amendment complaint, that's where the allegation appears. There's a reference to a known ISIS account. I don't know what that means, but it's certainly not an allegation that Google knew that account was an ISIS account at the time that revenue was allegedly shared with it. Counsel, what would be helpful for me is if you could assume that that is a plausible allegation, that Google knew that was an ISIS account, and that Google shared revenue with ISIS, because I think that is alleged, and I'm curious about your position about why the revenue-sharing claim would fail, please. Sure. Reserving the point about knowledge, but assuming that that part of the claim was properly pleaded, the first problem, and this is most obvious with respect to any claim of direct liability, which I think was the main way that the claim was alleged, there's not anything in the complaint that specifically ties it to aiding and abetting, but I will address that separately. With respect to direct liability, there is not even, other than a very token allegation, there is no allegation that any revenue that was theoretically shared, really in connection with the one video that they mentioned in the complaint, had any causal connection, certainly not a direct causal connection, to the Harris attacks, which is clearly required by this court. So, with respect to secondary liability, neither in the district court, nor frankly in this court, nor in their complaints, have the plaintiffs ever alleged that the revenue-sharing allegations on their own, or even not on their own, are connected to their claim of secondary liability, so it's just not an argument that was ever made. I don't understand, why do they have to do that? They have facts, they have a theory, why don't we just take the facts from the theory and put them together and see if they fit? Yeah, I'm happy to, I'm just sort of pointing out why I think Judge Ryu didn't address this as a secondary liability issue, because it was not an argument that was made to her, but I think you're right, Judge Berzon, we certainly can do that, and I think it's clear, looking at Halberstam, and looking at the text of 23d, you can see that that revenue-sharing allegation, which is extremely limited, there's no allegation, as I said, there's one allegation about one video in which some revenue may have been shared, you don't have any allegations about the extent of the revenue-sharing, about the money that was allegedly provided, etc. So there's simply no plausible factual basis that you could come up with to say that that satisfies, I think, any of the Halberstam factors. Because it's not substantial assistance? It's simply not substantial assistance. So you're relying on the six factors, is that right, counsel? You're relying on the six factors? So I'm relying on the language of the statute, which says knowingly provide substantial assistance, and then Congress has instructed the court to look at Halberstam as being illustrative of the standard that applies to aiding and abetting claims under 2333d. When we get to the six factors, we're talking about the nature of the Encouraged Act, the amount of the assistance, and so forth, right? Those six factors. And so I take it what you're arguing is that the revenue-sharing, it's not plausibly alleged that Google contributed substantial assistance. That is exactly right. So you could just march through the factors. So the nature of the Act Encouraged, there's nothing actually encouraged. The amount of the assistance, minuscule but not even alleged. The presence or absence at the time of the tort, not alleged and not existent. The defendant's relationship to the principal, again, it's very personally alleged. State of mind, again, you have to look at the allegations about knowledge and intent with respect to revenue-sharing, which essentially are non-existent. And remember, it's important to understand that even taking the allegations of revenue-sharing for what they are, we are talking about, this is not a case like Vaughan, where you have a deliberate donation to a terrorist organization. This is an allegation about a platform-wide revenue-sharing program that applies to millions of accounts. And there, actually, on some instances, or on this one instance, there was an ISIS video that got caught up in that program. Well, they're not. Counsel, could I back up? I think a closing counsel would say, and it would be helpful for me to get your response to this, right? If I could just give you that opportunity, it would be helpful to me. I think a closing counsel has said that the injury is not the tort, but not the shooting, as you said, the tort. But in fact, it's these atrocities that are committed and then broadcast around the world, and that is the global terror. And so, I think what they would say is that, so I can get your response, is that the Injury Causing Act includes that global terror and that Google is, YouTube is present, present in facilitating the broadcasting, if you will, of that, of those atrocities. Would you like to speak to that? Yes, I'd be happy to. So, first of all, the standard for aid and identity liability that Halberstam announces, that then is incorporated into the ATA, clearly requires knowing substantial assistance to the principal violation. And in Lindy, the Second Circuit, looking at that language, made very clear that there has to be, and this is a quote, a relationship between the act of terrorism at issue and the secondary actors supporting the content. I think the statute, that is far from clear. The statute used to say that the, you have to aid and abet the person who committed the act of international terrorism, which in this case would be ISIS. It doesn't say that you have to aid and abet it with regard to the particular act. And that was consistent with Halberstam because in Halberstam it wasn't with respect to the particular act. Well, so a couple things about that. So, I think for one, I think the statute is not, I would agree, a model of clarity, although I do think that there is a continual reference in both 2333A and then 2333D to the act of international terrorism. Yeah, but there's also, this is part of a larger statute that makes material support a crime. I mean, we have cases where somebody sent $10,000 to a terrorist organization, didn't know what happened to the money, and they're in jail, in prison. So, this is part of a larger scheme and part of this statute was added later, it seems to me, to reach, to make it more consistent with the overall scheme, which is concerned about supporting the international terrorist organization and not with supporting, and not with conducting a particular, you have to, the person has to conduct, who was getting the money has to have conducted an act of international terrorism, but the statute itself doesn't have any connection to that act with regard to the aider and abettor. Yeah, so let me just respond to that. I mean, I think the clearest and best response to that question is that you have to understand the enactment of an aiding and abetting provision against background principles of aiding and abetting liability, which are... Right, but Happerstam is an interesting case because the aider and abettor did not knowingly provide substantial assistance to a particular crime of a particular burglary. She insisted she didn't know about the burglary. She certainly didn't know about the murder and nobody cared. Well, I wouldn't actually say that nobody cared. I mean, I think it's important when you look at Happerstam, and this is on page 486 of the D.C. Circuit's opinion in that case, the decision that was being approved by Jeff Wald in the D.C. Circuit, the district court had found very specifically that the defendant knew full well, the court says, of what her husband was doing when he was going out. In general, in general. And that seems to be the case here, too. Google knew, in general, what ISIS was doing as an international terrorist. Well, I would submit that, first of all, the relationship that existed in Happerstam, the findings that were made specifically where they just received her disclaimers of knowledge about specifically what her husband was doing and specifically that he was going out at night and engaging in burglary. But the overall facts, I mean, they were living together, she was processing his money, she was providing all sorts of assistance and support to him over many, many years. This was a family relationship. She was the back end of the operation. I think she was laundering the money. Yeah, that's exactly right. But insofar as you're arguing that there had to be a connection to this murder in Paris, they did not have to prove that she knew he was going out that night to rob and to burglarize or to kill anybody. Well, yeah. We had to know that in general she was going out, he was going out to burglarize and that the killing was a foreseeable result. Right. I mean, what I would say is that the whole point of the substantial assistance test is to create, it's not a causation requirement per se, as Your Honor recognized, but the whole point of it is to create a relationship or to establish a relationship between the supportive conduct that the defendant engages in and the harm that the plaintiff suffers. That's the work that the test is doing. Right, and that's why we've been pushing so hard about what's the principal violation here because the plaintiff clearly includes the murder and doesn't include more. So I'll get out of your way. Go ahead. Yes, I think that the right answer is that the principal violation in a case like this is the particular attack and issue. I think that is the right answer. I will say I don't really think that at the end of the day it matters for purposes of the allegations here because whether the principal violation is the terrorist attack specifically or some larger force of terrorist conduct that is engaged in, nevertheless, the way that the substantial assistance test works, what it's designed to do, and what principles of aiding and abetting liability have always been designed to do is to draw a connection between the defendant's acts and the injury. So here we have a tort claim. This is not a criminal case. We have a tort claim. We have an injured plaintiff who was injured in a particular terrorist attack. And what we're trying to do is link the support that was allegedly given with that injury. So I don't think you can... You might be. And we've talked about that as one possibility. It's why we're pushing really to understand does this include, because the complainant includes an allegation that to add insult to injury, and I don't mean to be flip, but it does say to exacerbate this terrible injury, there was this bragging post-conduct on the internet and this global terrorism. Hence Judge Gould's question about, which I don't think we ever got answered, the question about how does the... Do the plaintiffs in this case have standing to complain about the other part of the harm, the global terror? Right. So I don't know that I would think about it as a standing inquiry, but I do think that the fact that this is arising in a tort case is very important. It's important to think about Section 230 and it's important to think about how we apply these standards. Because what we have to do through this six-factor test is we have to create a sufficient link between what YouTube here, Google here, is alleged to have done and what happened to this particular plaintiff. Okay, so right there, right there. Forgive me for interrupting you, but that's because... I'm just playing devil's advocate. I agree with you absolutely about the Halberstam test and the six factors and... But your premise is that the causation... I should say that the connection has to be to the injury, which is limited to Ms. Gonzalez's death. And that's what we're trying to get... You don't seem to want to be flexible on this point, but they are now... And I read the complaint that way. I certainly read the complaint to be about principal injury and allegation. I'm with you. But if it is expanded because there's this other allegation in the complaint about... So that the injury in your tort, right? So if the injury is broader and includes this terrorism component, then what do we do with these factors, sir? Right. So... I would say this. If we're talking about the revenue sharing then part of it is part of the case. The rest of it I think we can talk about sort of under Section 230 grounds. I'm happy to talk about it under ATA grounds as well. But if we're talking about the revenue sharing, there is no connection whatsoever between the allegations of revenue sharing and not just the specifics of the Paris attack, but also the bragging or the taking credit for it after the fact. So if we can expand the injury in that way, which I agree is not pleaded, the revenue sharing doesn't get you closer to that connection. Two things. First of all, what about... It would be useful to me if you would address Judge Katzman's just saying. Sure, sure. I.e. that 230 does not contest. And I understand that you may have some law that's part of this way, but not all of it. To the contrary. But I thought that his observations about the limitations of 230 with regard to what it means to be a publisher as opposed to recommending these videos to other people and otherwise essentially linking people together through various YouTube factors who wouldn't be linked otherwise, not just because of what they're saying on a large platform, but also because the platform is promoting people to listen to them, doesn't seem to be properly within 230. And that's somewhat persuasive to me. I understand that especially the very last case of ours from last summer, in passing, some of this maybe isn't 230, but it doesn't do it very profoundly and it isn't clear that they're talking about the same kinds of connectivity. So what about that? Sure. So a couple of things. So I do think to begin with that most of what Judge Katzman, if not all of what Judge Katzman is talking about insofar as he's talking about the use of recommendation algorithms is precluded in this court by the decision in DIROC, which I think resolves categorically that those kinds of... All right, well, does that seem right to you, though? I mean, you know, okay, so maybe we as a pre-judge panel couldn't deal with it, but why? Why does that come within a publisher? Sure, sure. Given the very strange structure of 230 to begin with and the fact that there is, you know, a not implausible argument that they were talking about causes of action and which publication wasn't element of the cause of action, might be liable. Why here does doing something other than being a platform to say something come within 230? So the answer to that, I think, is largely the answer that the judge Roni  which is that the way that the courts, including this court going back to Basel and Barnes and all the other Ninth Circuit cases, have read 230 is very clearly to say if the claim is seeking to hold you liable, in your capacity as a publisher for engaging in traditional publisher function. Right, the argument is that telling a person who bought your book to go read another book is not a publisher function. It's a business promotion function. Right, so I think that's just not true. So I think, so again, let's talk about the specific allegations here. The allegations here, if you look at the allegations about recommendations or algorithms, they're different from what they were in force. I think it's important to say that. It's really what they are alleging. If you look at those allegations, there are paragraphs, the cases 182 to 184 of the Joint Appendix are the standard YouTube content suggestion algorithm which is, if you watch a video on YouTube, you will see on the right-hand side of the page thumbnails of other videos. So these are algorithms that apply completely across the board. There's not any allegation, no allegation at all, that they have anything specific to ISIS or terrorism. But there is an allegation that they were, that if you go look at, as I understood it, if you go look at an ISIS video, they're going to tell you, oh, here are some other essentially ISIS videos that you might be interested in. And that's going to connect you to other people who are more to ISIS than you were connected before and draw you in and have you ultimately become part of this network. Well, again, the allegations here are quite general. There are some references to the way in which those standard generalized algorithms might have applied in the context of ISIS videos just as they might have applied in the context of cat videos or, you know, people singing in their living rooms. Right, but still, Google knew that this was happening. And the impact is that now you're building a bigger organization than anyone has before as a functional matter. Why is that covered by 230? So, first of all, the selection, arrangement, and recommendation of content is in fact a core and traditional publisher function. I mean, it is in that way, as Joanie points out... That's not selection. It's not selection. It's a reference to something else. It's not that you're selecting this video. It's that you're telling people to watch this video that you're also going to watch that video. Well, no, I think it is a function of selection. It is, at least as the way in which YouTube does it, the way in which it's alleged here, it is there's a video you are watching on one part of the screen, and then on the right part of the screen are several other videos that are related to that. That's really all it is. And so I don't think that's in any way distinguishable from all sorts of other selection and arrangement of content that online publishers do that is traditional publisher activity. So, again, there's no allegation that this is anything other than a completely neutral algorithm that is, say, neutral with respect to the legality or illegality of the content. And if it is... Can I ask you another question? Can I? Sure, of course. There's an Amicus brief which talks about first-man issues, which I thought were provocative and interesting. But you haven't raised any first-man issues here, even as a statutory interpretation backdrop. Yet, at any event. So should we just not worry about it for now? I think you should worry about it. I mean, what we have done, I think maybe not in our brief in this case, but I think in the brief that was filed in the first group was a party to the Tom and Claymore cases, which are going to be argued next. In those cases, the way in which the courts apply a particular material support statute, but I think this also relates to the standard for secondary liability, where you are talking about broad-based and large-scale platforms for speech like Google, Twitter, and Facebook are, a standard that says you may be liable for material support or you may be liable for knowing that you are providing substantial assistance to ISIS, that is applied based fundamentally, as the claims here are, on a generalized awareness that somewhere on the platform might be terrorist groups and a failure to do enough to go root out and find and remove that content. That kind of knowledge standard treads very close to the First Amendment. And therefore, the way that the material support statutes and the way that Section 23 has to recognize and take account for getting First Amendment concerns. We don't doubt that giving a printed press to ISIS or a whole ream of paper would be material support and possibly under discretion. You can link it up to procedurally. In other words, it would be outside 230. Providing a printing press. A printing press or paper. Well, I mean, I think that, you know, if we're talking about traditional printings offline, I don't think you have a 230 issue. You send them a printing press. Yeah, I mean, I don't think that would be covered by Section 230. And it wouldn't be covered by the First Amendment either, right? No, I mean, that's probably right. So the point that I'm making, I think this actually is very, very important in thinking about all of the knowledge issues in the case, is that there's a fundamental distinction in the law and in the way that the other cases come out between situations where you have knowing and deliberate donations or services that are being provided to a particular terrorist organization. And in many of the cases that the plaintiffs rely on, the only knowledge issue is, well, did you really know enough about the organization's connection to terrorism? But there was no question that the bank or the donors were deliberately providing service to that entity on a very specific level. That's not this case. That is not this case. This is a case about a service that has hundreds of millions of users and accounts around the world, some of which are alleged to be linked to ISIS. And the theory of liability is that basically you didn't do enough to enforce its own policies to go find and remove those accounts. So to say that that amounts to knowingly providing material support or knowingly providing substantial assistance to ISIS, one, is not supported by any case law. Two, not supported by the actual provisions of those statutes, whether it's direct liability or secondary liability. And third, does, I think, get into some very treacherous First Amendment terrorism because you're talking in about to avoid liability, you have to engage in all sorts of monitoring and policing efforts that could suppress non-ISIS content, but content in some way or another close to this. Mr. Williams, Judge School, I want to apologize for interrupting your argument, but I'll note one point on timing and then I have a question for you. On timing, you're more than seven minutes over the argument time initially allotted. However, we gave that extra time to the appellants as well. So there's no problem with that. But if you could wrap up your argument in the next minute or minute and a half, we could proceed to the next issue. That's my timing comment. I also have a question. Unfortunately, it may date me a little. But if I went to Google, I went to YouTube, and I typed in to look for an Elvis Presley song like Hound Dog or Don't Be Cruel, and I played a video of that, on the side of my screen, I assume there would be a queue lining up that would show me other songs of that same genre or other songs by Presley or something of that nature. Am I correct? Yes, I believe you are, Your Honor. If I went to Google and asked it to show me some national park in the U.S. like Yosemite, and I watched a video on that, there'd probably be other national park videos showing up. I suspect if the algorithms were functioning correctly that there would be. And then in the context of alleged terrorist acts, if I were to watch a video on YouTube of someone's preaching that there should be terrorist acts, which I've never done, I'll say, but if I did, then would a bunch of other persons preaching in favor of terrorism show up on the side of my screen? Well, I will say as a factual matter that YouTube has done an extraordinary job in purging, removing, and blocking that kind of content from being on its platform. There are statistics that are published that 90% of ISIS videos are blocked without ever being uploaded through the algorithms that YouTube uses to do that. But I will say to your question about the content recommendation algorithm, the point of these algorithms is that they are applying across the service. They are not trying to favor or benefit any particular content. They're simply designed to say, if you're looking at this, we make a deduction that you might also be interested in this. And that is, as this court, let me just say this. One, those algorithms are completely indistinguishable from the algorithms that were issued in Dar es Salaam that this court said, as a matter of law, protected by YouTube. Judge Christen, I have one more follow-up question for me to ask, and then I'll have Judge Christen. My question is, when people get these things lined up in a queue on the Google or on the YouTube displays, how do we know if there's some intentional or reckless wrongfulness without letting the case proceed to discovery? For example, for all we know, there could be a Google executive who wrote a memo saying that we shouldn't be permitting this video because it will lead to other deaths and terrorist acts. How can anyone know something like that without some discovery? Well, I think we have a complaint. We have to take the complaint as pleaded. And just as in Xiroc, which was also a 12b6 case, just as in the D.C. Circuit's decision in Marshall Fox Smith, just as in this court's decision in Kinsey, where there's not any allegation made that those algorithms are designed in a non-neutral way, you have to take the complaint as it is. Based on that complaint, these algorithms fit very comfortably within... I'm not really totally understanding the neutral way. If they knew about it, and let's assume for the moment that it was substantial, which I think you have a fairly strong argument that maybe it wasn't, but it was substantial assistance, then why does the neutral or non-neutral matter? Exactly. I mean, as I understand, to go back to the general support concept, if somebody had a policy of just sending $10 in charity to every organization in the world, and one of them was Hamas, they'd still have a material support process. So in terms of why neutrality matters and what neutrality means, I mean, I think that question is really addressed by roommates. It is addressed by DIROP, and it's probably most directly addressed by the DC Circuit's decision in the Marshall-Waksman case, which sort of addressed the same argument and said, well, what we mean when we're talking about neutrality isn't that you don't look at content, but instead that it's neutral with respect to the question of whether it's intended to promote good content, bad content, illegal content, not illegal content. That's the sort of fundamental distinction that this court drew in roommates, which is where the sort of neutral- But it still has to be a publisher, right? It still has to be. Are we talking about 230 now or ATA? We keep moving around. Yeah, I was talking about 230. All right. So if you're talking about 230, then we still have to be, yes, it's quite broad with regard to what is required to be a publisher. And I understand that there's neutrality there. But then we're into the question of whether we've gone beyond that. But you know, you are way over your time. And I think- Before we conclude, Judge Christin had a question. Yeah, I think I'll just be quick. Counsel, I think you argued what you did. Argued when you were briefed. And I think you said today that you read the district court order as having alternate theories, invoking alternate theories that disclose of a claim entirely. That is not what the district court did. At ER 22, the district court said that the revenue sharing claims were not defeated by 230. So I may have misunderstood you. But I take it that on the revenue sharing, then you have to be relying on proximate cause. Yes? Yeah. So if I said that, I misspoke. What I was saying was she went on to hold that the entire set of direct infringement, direct liability claims failed under fields, which is an alternative holding. So those claims failed both under section 230 and fields. I agree with you that specifically with respect to the revenue sharing piece, she did not make a finding on 230 with respect to that set allegations. And we haven't asked the court to rule on 230 with respect to revenue sharing. We've said those don't state a claim for the reasons that we've said. I'm going to still wrap it up in summary, though. OK. Well, I think- Here's my question. Yeah. Judge Christin, if your question was answered, Mr. Willen, we thank you for your argument. But we'll need to conclude it. Thank you. And let me just comment that although a lot of time was used up, I said earlier that if the appellants wanted another two minutes for rebuttal, they'd get it. So does Mr. Tulchin or Mr. Altman, do we either want two minutes? Your Honor, Robert Tulchin wants to use the two minutes. You request it? Yes, Your Honor. That's fine. Go ahead. OK. I just want to quickly come back to something that has pervaded the argument today on both sides, this issue of principle violation. The principle violation in an action for international terrorism is not just the murder. If we step through Section 2331, the definition of international terrorism, which is what we're suing for, we're suing for somebody who was injured or killed by international terrorism, it involves a violent act. That's under 2331.1 sub A. But also under sub B, it appears to be intended to intimidate or coerce a civilian population or to influence the policy of a government. And that's in our brief on page A9. That statute is spelled out. So we're not suing for wrongful death or assault and battery. We're suing for ATA, which provides a cause of action when there has been international terrorism. So the component of the intention to intimidate the civilian population or influence the government is a part of the cause of action. The only other thing I wanted to say in my remaining 46 seconds is one of the judges today pointed out that there are people sitting in jail for sending money to terrorist organizations. It's a very real crime. They don't get out because of the First Amendment. They don't get out by saying, oh, freedom of expression, I have a right to support terrorist groups. Congress has said you may not provide services to terrorist organizations. If somebody tried to open a bank account at Wells Fargo Bank to funnel money to ISIS, that would be a crime that would be shut down. It would never be allowed. I see my time is just about up. So I just also want to say that I was very skeptical how the argument would go today, and I am actually thrilled. This is a tremendous opportunity, and the way that we have been able to sort of converse about the case, I think maybe when the crisis is over, people, we should think about doing this more often. Well, thank you very much, Mr. Phillipson. Okay, we'll conclude your argument now. Mr. Altman, did you want two minutes also? Then after that, we'll definitely end. Your Honors, I wanted to point out something. It's not directly with respect to Google, but one of the things that you should note, there was a memo that was written by Facebook. It was written just a few days after the Paris attack, and I just want to read it, and this is all I want to say. The memo said, we connect people. That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide so we can connect more people. That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a terrorist attack coordinated on our tools, and still we connect people. The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is de facto good. I think that sums up the perspective of these companies. Even if Google didn't say it, Facebook certainly said this, and I'm sure Twitter thinks the same way. This is not just publishing. This is not the same as when two-thirds came out, and I appreciate the court's time. Thank you very much, Mr. Altman. The case of Gonzalez versus Google shall now be considered to have the argument concluded and it shall be submitted. If the court and conference feels we need further argument, we can always call for supplemental briefs or set another argument, but we will take this under submission. Before we go to the next case, which is Claiborne and Tomna, are these two cases being argued separately or together? It's a question for the clerk. They will be argued together, Your Honor. Okay, before we go to that, let me ask my colleagues, Judge Berzon and Judge Christin, would the panel like a 10-minute recess? I would. So would I. No. I think I'm going to exercise my prerogative and make it 10 minutes. So we will take a 10-minute break, and again I'm going to thank all the counsel for excellent arguments under trying circumstances. Court will recess for 10 minutes. All rise. This court stands in recess for 10 minutes.
judges: Gould, Berzon, Christen